R. Terry Parker, Esquire
(*pro hac vice* admission to be sought)
New York Bar No. 4704748
Law Office of R. Terry Parker LLC
43 West 43rd Street, Suite 275
New York, New York  10036-7424
Telephone: (603) 226-2600
Email: terry@rterryparkerlaw.com

and

Steven T. Lowe SBN 122208
steven@lowelaw.com
LOWE & ASSOCIATES, P.C.
8383 Wilshire Blvd., Suite 1038
Beverly Hills, CA 90211
Telephone: (310) 477-5811

Attorneys for Plaintiff
**J.R. Wicker**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JEFFREY RYAN WICKER**. an individual; | **Case No:** |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| **DEREK KOLSTAD**. an individual; **THUNDER ROAD FILM PRODUCTIONS, INC.** a California corporation; and **LIONS GATE ENTERTAINMENT CORP.** a California corporation, | **COPYRIGHT INFRINGEMENT (FILM)** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

COMPLAINT
CASE NO.

The plaintiff Jeffrey Ryan Wicker ("Plaintiff"), by his undersigned attorney, for his Complaint against the defendants Derek Kolstad ("Kolstad"), Thunder Road Film Productions, Inc. ("Thunder Road"), and Lions Gate Entertainment Corp. ("Lions Gate" and together with Kolstad, Thunder Road, and Lions Gate, collectively, "Defendants"), alleges as follows:

## SUBSTANCE OF THE ACTION

1. This is a case of willful copyright infringement in violation of 17 U.S.C. § 106(1), and 501. In short, Kolstad, in drafting the screenplay "Scorn," which would become the films *John Wick* and *John Wick: Chapter 2*, copied Plaintiff's screenplay "Blood for Escobar." There are so many original elements from "Blood for Escobar" that are found in Kolstad's "Scorn" and later in his films *John Wick* and *John Wick; Chapter 2* that Kolstad could not have written those works without copying "Blood for Escobar." Thunder Road and Lions Gate then made further reproductions of the infringing movies, hereinafter "Kolstad's Movies." Defendants have thus profited enormously from the labors of Plaintiff. Accordingly, Plaintiff brings this lawsuit seeking damages in an amount to be established at trial.

## PARTIES

2. Plaintiff is an individual living and working in Atlanta, Georgia.

3. Kolstad is an individual living and doing business in Pasadena, California.

4. Thunder Road is a corporation organized and operating under the laws of California, with a principal place of business in Santa Monica, California.

5. Lions Gate is a Delaware corporation with its headquarters located at Colorado Avenue, Santa Monica, California 90404.

## JURISDICTION AND VENUE

6. This is a civil action seeking damages and injunctive relief for copyright infringement under the copyright laws of the United States, and therefore this Court has jurisdiction under 17 U.S.C. § 101 et seq.; 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1338(a) (jurisdiction over copyright actions).

//

//

7.     Personal jurisdiction and venue over Defendants are proper.  Defendants are conducting business in this judicial district and are committing torts in this state, including without limitation the copyright infringement at issue here.

8.     Pursuant to 28 U.S.C. § 1391, venue properly lies in this Court because a substantial part of the events giving rise to the claims herein occurred in this judicial district.

<strong>FACTS COMMON TO ALL CLAIMS FOR RELIEF</strong>

**A.     Plaintiff and His Copyrighted Work**

9.     Plaintiff is the author of numerous award-winning screenplays.

10.     In 2011, Plaintiff scored in the top 10 percent of contestants with "Blood for Escobar" in the Academy Nicholl Fellowships Competition.  The Academy Nicholl Fellowships Competition is one of the more prestigious screenwriting competitions in the United States.  The competition is designed to identify and nurture emerging talent, with the top contestants receiving substantial industry recognition.

11.     In 2008 and again in 2011, Plaintiff was a quarter-finalist in The BlueCat Screenplay Competition, a renowned international screenwriting contest known for its commitment to discovering and developing undiscovered writers.

12.     In 2012, Plaintiff scored in the top 5 percent in the Academy Nicholl Fellowships Competition with his script "Other Monsters."

13.     In 2018, Plaintiff was a finalist in ScreenCraft's Film Fund, one of Hollywood's top contests whose jury often includes high-profile executives and award-winning screenwriters from major companies and franchises.

14.     In 2013 and 2014, Plaintiff was a quarter finalist in PAGE International Screenwriting Awards, a contest with a panel of judges consisting entirely of working film and television professionals, including script readers, story analysts, agents, managers, and producers.

15.     In 2015, Plaintiff's screenplay "Sick People" was turned into a feature film starring C. Thomas Howell, Lin Shaye, Jasmin Guy, Afeemo Omilami, and Kristen Dalton and directed by Ken Farrington.  The film was produced by Twin Pilot Films and Vision-X Productions and released to the public in 2016.

16.     In 2018, Plaintiff was a finalist in ScreenCraft's Short Screenplay Competition, one of Hollywood's top contests whose jury often includes high-profile executives and award-winning screenwriters from major companies and franchises.

17.     In 2024, Plaintiff was a finalist in the Final Draft Big Break Screenwriting Contest—a major international competition run by Final Draft, Inc. the industry-standard screenwriting software company.

18.     In 2024, Plaintiff was a runner-up in Scriptapalooza's International Screenplay Competition, one of the longest-running competitions that emphasizes getting every submission in front of a producer, manager, or agent, not just a general reader.

**B.     "Blood for Escobar" is an Original Creation Authored by Plaintiff**

19.     In 2010, Plaintiff authored the screenplay "Blood for Escobar."

20.     "Blood for Escobar" depicts numerous original characters.

21.     The protagonist of "Blood for Escobar" is Alex Rosenthal, a wealthy physician who is grieving the loss of his wife from a terminal illness.  He also works as an assassin within a secretive network of assassins operated by a covert organization called the "Company."  The Company arranges the Kevorkian killings of clients who want their families to receive life insurance payouts.

22.     In "Blood for Escobar," the grieving Alex is humanized by his pet bird, Wolfgang, which he keeps in a beautiful cage in his mansion, speaking to the bird, calling it by its name, and treating it with care, highlighting his internal humanity and capacity for empathy and connection.

23.     Alex is depicted as a highly trained martial artist, an exceptional, if violent, athlete who is obsessive over order and punctuality, and the finer things in life.  He lives in a protected mansion and is driven in a limousine and a 1967 Shelby Mustang.  He is extremely fit and talented in martial arts but self-medicates the grief he suffers with heavy pours of whiskey and pills.  Despite the wealth and sophistication, he is described as having greasy hair, uncombed, and a stubbly face desperate for a razor.

24.     In contrast to Alex, there is the antagonist, Hector Cienfuegos, as in Hector 100 Fires, a rogue operative for the Company.  Hector has been sadistically torturing and mutilating

clients instead of providing them with the contracted painless death and is characterized by his cocaine and coffee fueled sadism and his ardent admiration of Pablo Escobar, the cocaine Kingpin of the 1990's.  Hector employs brutal, machete-based torture methods which are attributed to Escobar.

25.     Another unique character depicted in "Blood for Escobar" is Alex's driver, Brice, a former NASCAR driver showcasing the scripts "car-fu" scenes, a blend of car and kung fu sequences in which the driver uses the car's movement—spins, drifts, door swings, bumper strikes, and controlled impacts—as deliberate combat movements for a scene.  The car acts as an extension of Brice's body.  We first meet Brice early in "Blood for Escobar" as he chauffeurs Alex in a limo, racing through traffic, calm, calculating.  Brice also masterly handles Alex's 1967 Shelby Mustang GT-500 in car-fu scenes where his driving skill and the Mustang are weapons used to destroy chasing vehicles through calculated spins, stops, and impacts.

26.     Brice is the nephew of Claude, Alex's butler, called Mr. Germany and devoted to Alex.  The Claude character stands out for his absolute discretion, never acknowledging the killings, never asking questions, maintaining the absolute secrecy of the Company, adding a civilized formality to the illegal enterprise of his boss and moving the character beyond a generic "loyal butler' trope.

27.     Another unique character in "Blood for Escobar" is Alex's 60 year-old father-in-law, Tommy, a veteran assassin whose special skill is marksmanship.  He is a grieving, retired assassin, living in isolation with his old dog, but is pulled back into the assassin game for one more job.  He is described as one of the few people Alex genuinely trusts even though we see early on that Tommy was planning to kill Alex before becoming Alex's guardian angel in the story, so there is a conflicted-loyalty that gives tension to the Tommy character in his relationship to Alex, moving the character beyond the generic mentor/sidekick trope.

28.     Another character in "Blood for Escobar" is Delores, an elderly secretary who appears in an awkward and uncomfortable early scene.  She works below a sign that says "Death and Property of Death Services."  She is harassed by her employer, Humphries, if jokingly, but ignores him as she goes about her work, flipping through files, noting "He's dead.  She's dead . . .

he's dead" and we are told "Don't mind [] Deloris. She's been on death duty for thirty years." Her employer then slaps the desk and says "Have't ya, ya old bitch," in an extremely awkward scene that resonates in the screenplay.

29. The Company is a unique organization conceived by Plaintiff, a secret governing body in the criminal underworld of assassins. It is ritualistic, bureaucratic, and powerful. It is described as a ghost company, a "they" that makes the rules, but Alex, in the beginning at least, lives within the rules of the Company, killing his victims in accordance with the job and complying with the Company and its underworld etiquette with polite acceptance, even when the Company kidnaps him from his limo in one scene and he is taken to appear before a committee of silent suits at a long desk, the "High Committee," who offer him the job of taking out Hector. Alex greets the kidnapping by the Company as the routines of work.

30. In addition to original characters, some examples of which, but not all, are referenced above, the plot line of "Blood for Escobar" is original.

31. The plot of "Blood for Escobar" follows Alex who, as an act of mourning for the loss of his wife to a long fight with a brutal, chronic disease, assassinates his targets and hunts down his nemesis, Hector, who is coming for him.

32. A key element in the sequence of events in "Blood for Escobar" is the invasion of Alex's guarded home by Hector and the loss of Alex's pet bird Wolfgang. Alex awakes in the early morning hours to be confronted by Hector who knocks him out with the butt of a gun. Attacked at that hour, in bed, awakened from sleep to immediate violence, forces the protagonist to acknowledge his ultimate vulnerability. The invasion of his home by his antagonist upends Alex and his routine, propelling him to action. In addition, the home invasion puts an end to the self-medication of the grief with heavy drinking and pills. Violence becomes his way of coping with his grief.

33. Another key element in the plot of "Blood for Escobar" is, after the home invasion, Hector and his Columbian hires are eventually confronted by Alex and Tommy at a high society art show. The scene features a DJ, deafening futuristic music defined by throbbing, loud bass which drives the momentum of the scene. There are long stemmed champagne

glasses—raised in toasts, applauding the artist.  Alex is there to assassinate the artist but, when Alex learns the artist no longer wishes to die, he disobeys the Company and does not kill him.  The social refinery of the upper-class artworld is shattered, literally, as Hector enters and an enormously violent shootout occurs with exploding glass walls and glass tanks, a staggering body count, mixing beauty and violence and, literally, corporal flesh.

34.    This violent confrontation with Hector also depicts the internal conflict inside Alex where, when he has the muzzle to the head of a contained Hector, he is unable to pull the trigger, endangering Brice and Tommy and showing the conflict of his different selves, the husband, the doctor, the killer.  The scene raises thematic questions about life, death, and the body, using mirrors, art, and violence to explore the idea of the self as an illusion, echoing a line from the early home invasion scene: "The room is the materialization of his self pulled inside out.  Each broken mirror ... each smashed picture proof of his shattered state."  Ex. A at p. 70.

35.    Another key element in the sequence of events in "Blood for Escobar" occurs after Alex is unable to kill Hector at the art gallery leading to a day-time scene where, through the reflection of Hector's sunglasses, we see Alex's mansion in flames just before men from the Company arrive in a limo and kidnap Hector to take him to see the High Committee at the Company, the same long table of silent suits where Alex was asked to kill Hector.  Here, with Hector at the long table, we learn that the Company has turned on Alex for violating its rules when he did not assassinate the artist at the gallery.  The Company puts a hit on Alex and he is stripped of his status as alpha assassin, transforming him into a target, exiled from the Company.

36.    In a final showdown with Hector, at a loud strip club, Alex tracks Hector down in a bathroom stall and shortly after finishes him off with a headshot.  Alex can now make his escape from the underworld of crime.  Put the violence behind him.  The plan is to go to Barbados and live on a beach with his love interest, Gwynn.  However, we know the Company is still coming for Alex, and, when he is unarmed in an airport, he is intercepted by a character called the Contact from the Company.  "Why am I still alive," Alex asks.  The Contact allows him to leave, with the promise to never return.  The plot ends with Alex at the beach in Barbados with Gwynn, vulnerable, some hope at happiness.

37.     "Blood for Escobar" is an original creation of Plaintiff.

38.     Plaintiff is the sole and exclusive owner of all copyrights in and to "Blood for Escobar," a copy of which is attached hereto as Exhibit A.

39.     On September 2, 2010, Plaintiff registered "Blood for Escobar" with the Writers Guild of American's Script Registry, a copy of which is attached hereto as Exhibit B.

40.     On October 6, 2025, Plaintiff obtained a certificate of registration from the United States Copyrighted Office for "Blood for Escobar," Reg. No. PAU004279151, a copy of which is attached hereto as Exhibit C.

**C.     Kolstad's Access to "Blood for Escobar"**

41.     Plaintiff is informed and believes and therefore alleges that Kolstad had access to Plaintiff's "Blood for Escobar" as a result of the widespread dissemination of Plaintiff's work among film industry professionals in Hollywood.  From 2010 to 2012, "Blood for Escobar" was disseminated to numerous contests in Los Angeles, including, but not limited to the Academy Nicholl Fellowships Competition, the BlueCat Screenplay Competition, Sciptapalooza, and Final Draft Inc.'s Big Break Screenwriting Contest.

42.     Numerous production companies and agencies in Hollywood actively mine these contests for new material, including companies with close ties to Kolstad like Motion Picture Corporation of America ("MPCA"), known for producing commercially accessible, mid-budget films for major studios and streaming platforms, Voltage Pictures, an independent film production, financing, and international sales company founded in 2005; Circle of Confusion, originally a literary-focused discovering unconventional voices and helping genre writers break into film and television; Benderspink, a highly influential, boutique Hollywood production and talent management company, Zero Gravity Management, a literary and talent management firm known for developing screenwriters and directors, Kaplan/Perrone Entertainment, a respected management and production company known for representing screenwriters, directors, and producers, and United Talent Agency ("UTA"), once a mid-tier literary and talent agency that has evolved into one of the powerhouses in Hollywood.  Each of these companies have worked closely with Kolstad during the relevant time period.

43. As a result of Plaintiff's wide dissemination of "Blood for Escobar" among the above-described script writing contests, there is a reasonable possibility that Kolstad had a chance to view "Blood for Escobar" prior to writing "Scorn" and creating the films *John Wick* and *John Wick: Chapter 2.*

44. Access here is further established in the following chain of events which establish a reasonable possibility that Kolstad had a chance to view "Blood of Escobar" prior to creating the Infringing Works.

*Access through Goldberg and Adler*

45. Two well connected individuals associated in 2010 with the contests Scriptapalooza, BlueCat, and the Nicholls competitions as well as New Wave Entertainment are Mike Goldberg and Josh Adler. Mr. Adler and Mr. Goldberg were reportedly roommates when they first moved to Los Angeles. Both men began their Hollywood careers together in the marketing and acquisitions department at Paramount Classics, which gave them early exposure to the independent film ecosystem and the mechanics of evaluating material. They later co-founded Abstract Entertainment, a boutique literary management and production company representing emerging screenwriters. In 2010, they sold Abstract Entertainment to ROAR Management and moved as a team to New Wave Entertainment. Kolstad has credited both for launching his career.

46. In or around 2010 to 2012, upon information and belief, Mr. Goldberg served as a contest judge at Final Draft Inc.'s Big Break Screenwriting Contest, where Plaintiff had submitted "Blood for Escobar." There, upon information and belief, Mr. Goldberg obtained a copy or copies of "Blood for Escobar" in his quest for great screenplays that could be shaped into successful film projects for production.

47. Mr. Goldberg, upon information and belief, also obtained a copy or copies of "Blood for Escobar" through his work and connections with the Scriptapalooza contest.

48. Mr. Goldberg has publicly stated his love for judging screenwriting contests, "it excites me like Christmas morning because you never know what great scripts you can discover when you are doing a contest. We're always on the lookout for unique voices and ideas. Judging

this contest is the best way to find them." *See* https://scriptmag.com/features/big-break-judge-mike-goldberg.

49.   In addition, Plaintiff is informed and believes that Josh Adler had access to a copy of "Blood for Escobar" through Mr. Goldberg at some point from 2010 to 2012.

50.   Plaintiff is informed and believes that, at New Wave Entertainment, Mr. Adler together with Mr. Goldberg worked together with Kolstad to draft a script titled "Scorn," which is based on Plaintiff's "Blood for Escobar." Using "Blood for Escobar" with its cover page prominently displaying the name "J.R. Wicker," Kolstad, with the assistance of Mr. Alder and Mr. Goldberg, derived the character John Wick.

***Access through Ferraro and UTA***

51.   In addition, Kolstad had a reasonable chance to view "Blood for Escobar" through his association with UTA, the same agency that represented Derek Kolstad at the time he allegedly wrote "Scorn." For example, Charlie Ferraro is the agent at UTA said to have discovered Kolstad and "Scorn" and architected the deal that launched the *John Wick* franchise. As evidence that UTA knew plaintiff's work, UTA has even directly requested copies of Plaintiff's scripts from Plaintiff on numerous occasions. In short, upon information and belief, UTA possessed a copy of "Blood for Escobar" at the time it was dealing with both Plaintiff and Kolstad.

52.   Moreover, this is not the first accusation of copyright infringement involving a Hollywood defendant obtaining access to a plaintiff's copyrighted work through Charlie Ferraro and UTA. In the case *Jordan-Benel v. Universal City Studios, Inc.*, a screenwriter, Jordan-Benel, alleged that the film *The Purge* was based on his earlier screenplay, "Settler's Day," and that the defendants, the distributor Universal City Studios and the writer/director James DeMonaco had access to his script through UTA. *See* 2015 WL 3888149, at *2 (C.D. Cal. June 24, 2015), *aff'd*, 859 F.3d 1184 (9th Cir. 2017). Judge Fitzgerald held that allegations of possession by a third party with dealings with both plaintiff and defendant can establish access by defendant. *Id*.

53.   Accordingly, Plaintiff is informed and believes that Mr. Kolstad worked with Charlie Ferraro at UTA, to revise the "Scorn" script and shop it around Hollywood until Basil

Iwanyk at Thunder Road Pictures acquired the copyrights in the script where the project was retitled "John Wick."  Basil Iwanyk at Thunder Road Pictures, upon information and belief, worked with Kolstad to revise "Scorn" into what would become *John Wick* and *John Wick: Chapter 2*.

54.     The *John Wick* film, which premiered in U.S. theaters in 2014 and was distributed by Lions Gate is copied and derived from "Blood for Escobar".

55.     In addition, Kolstad's film *John Wick: Chapter 2*, which had its premiere on January 30, 2017, and was subsequently released nationwide in the United States on February 10, 2017, is copied from "Blood for Escobar."

56.     The films *John Wick* and *John Wick: Chapter 2* are collectively referred to herein as "Kolstad's Movies" and together with "Scorn," collectively, "the Infringing Works."

57.     A telling indication of Kolstad's access to "Blood for Escobar" is found in Kolstad's film project titled *The Package* (2013), which immediately preceded *John Wick* (2014). *The Package* featured an assassin character tellingly named "Tommy Wicker," the name of the isolated 60 year old assassin with a dog in "Blood for Escobar" and a very uncommon name that is shockingly similar to that of Plaintiff, "J.R. Wicker," which appears on the cover page of "Blood for Escobar."  The likelihood of Kolstad using the name "Tommy Wicker" for an assassin in his screenplay "The Package" and later using the name "John Wick" in the "Scorn" screenplay, absent access to Plaintiff's work, is statistically extreme.

58.     Another telling indication of Kolstad's access to "Blood for Escober" is the change in Kolstad's writing style that occurs after studying Plaintiff's writing in "Blood for Escobar." While Plaintiff does not yet have access to the final scripts used in Kolstad's Movies, the writing style exhibited in "Scorn" (a copy of which screenplay Plaintiff does possess and is attached hereto as Exhibit D) and "Blood for Escobar" is strangely similar.  Both works use a number of stylistic anomalies that were not found in the industry at the time.  These stylistic anomalies included the excessive use of colons, semicolons, and ALL CAPS to emphasize objects or produce dramatic reveals in the story.  There is also an unusual use of ellipses for the same effect. Both scripts use approximately 70 ellipses to build tension.  A rhythmic pacing is also achieved in

both scrips with the use of the "...and." formula. This "...and." formula gives a specific rhythmic transition. It is used ~30 times in each script to dictate camera pacing (e.g., "...and crashes"). Upon information and belief, Kolstad's previous works did not use this unusual staccato writing style, nor was it used in other scripts in the industry at the time. A study comparing, for example, the odd use of dashes to control pacing in Plaintiff's works "Blood for Escobar" and "Other Monsters" and the odd use of dashes in Kolstad's "Scorn" and the first page of his work "The Package" shows a statistically high rate of use in Plaintiff's works as well as "Scorn" that is a statistical anomaly in the industry, especially where there is no such use in "The Package."

59.    The similarity of the Kolstad's new writing style in 2012 and Plaintiff's in 2010 aside, there are numerous similarities as discussed below that are so striking that access is established.

60.    In addition to the foregoing, given the number of industry professionals who were judges in competitions where Plaintiff's "Blood for Escobar" appeared, Plaintiff reasonably alleges that there are other connections between the screenplay "Blood for Escobar" and Kolstad that will be revealed in discovery.

**D.    The Substantial Similarity between Plaintiff's "Blood for Escobar" and the Infringing Works**

61.    In or about 2025, Plaintiff viewed *John Wick* and was stunned by the number of similarities between that film and his "Blood for Escobar." He then viewed *John Wick, Chapter 2* and again was stunned by the number of similarities. Plaintiff then researched Kolstad and eventually obtained a copy of "Scorn" and learned that, not only did Kolstad have access to "Blood for Escobar" but he intentionally, blatantly, and without authorization, copied "Blood for Escobar" in creating the Infringing Works as is evident from the numerous similarities between the Infringing Works and "Blood for Escobar."

62.    The Infringing Works are strikingly and substantially similar to "Blood for Escobar," including similarities of copyrightable elements such as characters, plot, theme, setting, dialogue, and the sequence of events that drive each story.

//

*Characters*

63.     The protagonist in "Blood for Escobar," an alpha assassin recently widowed, dealing with his grief through violence working for and against a secretive network of killers operated by a covert organization that arranges killings for clients is an original expressive element authored by Plaintiff.  "Scorn" and Kolstad's Movies each center on a wealthy hitman who is recently widowed, grieving through killing, tied to a secretive network of killers operated by a covert organization that arranges killings for clients.  The John Wick character in "Scorn" is, like Alex, not a young man. He is roughly in his fifties.  In Kolstad's Movies, the character John Wick, played by Keanu Reeves, is a younger man (of approximately 40 plus years) but is otherwise a copy of Alex in "Blood for Escobar."

64.     A further similarity in the protagonists is that, in each work, the protagonists are hitmen with medical expertise.  In "Blood for Escobar," the hitman is a doctor and in Kolstad's Movies, the protagonist shows advanced medical expertise, suturing, hooking up IVs, performing blood transfusions, with no explanation as to how he came about these skills.  "Blood for Escobar" and Kolstad's Movies both have protagonists who demonstrate clinical competencies that are not common conventions in the revenge thriller genre, and unique elements that are present in both works.

65.     The protagonists in each work are defined by a high-value, silver-screen era Ford Mustang as a primary character motivator.  "Blood for Escobar" features a 1967 Shelby Mustang GT-500.  "Scorn" and Kolstad's Movies feature a 1969 Ford Mustang Boss 429.  Another similar treatment is the Mustangs appear initially in each script as "parked," sitting still in the protagonist's garage, representing the hero, powerful but parked, the model and year noted in capital letters—a unique depiction of a car in a screenplay.  So the similarity is not merely that they are both vintage Mustangs but how they are presented in the works.

66.     Plaintiff's character Tommy, a former hitman and marksman, who had planned to kill Alex but becomes more of a guardian angel and comes to protect Alex in his battles with the antagonist by offering assistance as a marksman is mirrored in the character Marcus in "Scorn" and the film *John Wick*, an older father figure who, when we first meet him, intended to kill the

protagonist John Wick but who in the end serves as a guardian angel for Wick, aiding the protagonist with marksmanship skills.

67.     Plaintiff's character Mr. Germany, the butler who stands out for his absolute discretion, never acknowledging the killings at the center of the house he runs, never asking questions, maintaining the absolute secrecy of the work with the Company, euphemistically referring to his boss's "rides," in an almost-flirtatious code of kill etiquette making death service a high class concierge affair, adding a civilized formality to the protagonist's criminal underworld.  Mr. Germany's character and role is mimicked in the Concierge in Kolstad's Movies.

68.     The character Hector is an original element of "Blood for Escobar."  He is an antagonist who is a part of the criminal underworld of the Company but has now gone rogue from that secret governing body of assassins and operates outside the norms of the system.  He is an incredibly violent and feared alien attached to the Columbian mafia, and he is coming for the protagonist.  Similarly, the antagonist Viggo in "Scorn" and in the film *John Wick*, is an antagonist who is a part of the criminal underworld at the Continental who is coming for John Wick.

69.     The character Delores is an original creation authored by Plaintiff.  She is an elderly secretary who works in "Death and Property of Death Services" as an apathetic death-clerk, flipping through folders muttering "He's dead... she's dead..."  Dolores gives a tone to "Blood for Escobar" where death is processed by bored, matronly administrators.  She is a highly specific expressive choice that replaces the "gritty mob" trope with a "bureaucratic noir."  Dolores and her role in "Blood for Escobar" are copied in *John Wick: Chapter 2* in a scene that depicts a switchboard of matronly, apathetic women who process murder orders with the same mechanical indifference as Delores.  This similarity between Delores in "Blood for Escobar" and the matrons who process murder orders in *John Wick: Chapter 2* is striking and substantial.

70.     Moreover, the concurrent presentation of all five of these substantially similar characters in both works constitutes an independently protectable selection and arrangement of elements which is copied in the Infringing Works.

*Plot and Sequence of Events*

71.    There are numerous similarities between the selection and arrangement of the sequence of events in "Blood for Escobar" and the Infringing Works, structured to create meaning, tension, and emotional or thematic impact.

72.    In "Blood for Escobar," Plaintiff creates a sequence of events depicting a protagonist, an assassin shown early in the story in his well-to-do home, in his bathrobe, drinking too much, suicidal, grieving as a result of the passing of his wife from terminal illness. Plaintiff humanizes his protagonist with a relationship to a pet but the protagonist then suffers the humiliation of a home invasion and the loss of the pet. The home invasion is sudden and the protagonist is knocked out by the antagonist with the butt of a gun. He wakes in the same room, humiliated, helpless, and vulnerable. This is the humiliation and vulnerability that triggers the protagonists' quest for revenge. The protagonist then moves emotionally from the healing process of grief, the quiet reflection, the empathy and emotional connection with other creatures, to embrace his violent payback as he tracks down his antagonist. Similar to "Blood for Escobar," both "Scorn" and the *John Wick* movie mimic this same sequence of events to create the same meaning, tension, and emotional or thematic impact. We see the same movement from a grieving assassin shown in his well-to-do home, drinking too much, suicidal, humanized by a pet. And then he suffers a home invasion where he is knocked out with the butt of a gun, wakes up in the same room, humiliated, and that home invasion triggers the protagonists' quest for revenge. He then grieves through violence.

73.    Another sequence of events in "Blood for Escobar" that is similar to "Scorn" and the film *John Wick* (and which occurs immediately just after the foregoing) is the protagonist retrieving hidden weapons from a secret cache within his home after the home invasion, setting up the revenge sequence, with retaliation occurring, in "Blood for Escobar" and "Scorn" *and John Wick*, not only in a night club, but in a bathroom stall of the night club, where the antagonist is found. The sequence and arrangement of these plot beats in "Scorn" and the *John Wick* movie are not just similar but almost exactly reproduced.

74.     Next, in *John Wick: Chapter 2*, the antagonist, Santino D'Antoni, a member of an Italian crime gang, torches John Wick's home, just as Hector Cienfuegos—Hector 100 Fires—torches Alex's home.  The selection and arrangement of the torching of the protagonist's home by his antagonist to show vulnerability and helplessness, especially with each of the foregoing similar elements, is an original expression protected by copyright law.

75.     Another plot/sequence of events similarity originally authored by Plaintiff in "Blood for Escobar" is the plot movement of the protagonist from a favorite of the covert governing body of assassins to, after he breaks a rule, a target of the governing body.  This specific institutional trajectory—moving from protected "accomplice" to abandoned "target"—is a unique structural arrangement.  This same sequence of events is found in *John Wick: Chapter 2*, the arc beginning with the protagonist as a favored of the covert governing body of assassins, moving to a target of the governing body.

76.     In both "Blood for Escobar" and *John Wick: Chapter 2*, a key scene for the plot occurs at an art exhibit.  In both works, the scene involves a high-society celebration that turns into a violent gun battle between the protagonist and the antagonist, a gun-fu shoot-out that takes place among glass art installations and glass walls with an unusually high body count.  It is a triple digit body count in both works.  In both works, it is the penultimate show down for the protagonist and antagonist.  In both works, it is a scene that forces the protagonist to confront the confusing and many reflections of who he is.

77.     The sequence of events within the art exhibit shootouts is eerily similar.  Both feature futuristic, deafening music, a unique, non-tope choice for a high art museum setting.  The protagonists begin at the periphery of the event and amidst deafening music move deliberately toward the center, threading through a crowd that is unaware of the imminent violence. This progression from the outskirts of the room into the heart of the gathering establishes a shared narrative rhythm.  A key point of comparison is the airborne takedown. In both works, the protagonist executes a flying leap into a body-to-body collision, resulting in a tumbling descent to the ground with the target.  Immediately following the takedown, both scenes employ a wrist control disarming of a gun. The protagonist seizes the target's firearm bearing wrist, redirects the

muzzle, and forcibly strips the weapon from the opponent's hand.  This is not incidental choreography; it is a specific, technical action maneuver that serves as the transition from the initial collision to the close quarters struggle. The wrist lock is the final moment of clarity and precision before the scene escalates into broader chaos.

78.     The environmental context further strengthens the parallel.  In both scenes, the eruption of violence shatters the refined atmosphere: champagne glasses break, patrons scatter, and the contrast between elegance and brutality becomes a defining visual.  The fragility of the long stem glassware underscores the violence of the wrist manipulation, creating a symbolic inversion between delicacy and force.

79.     Both sequences culminate in a pursuit into an art installation designed around optical disorientation.  In "Blood for Escobar," the chase continues into an artist's installation built to distort perception.  In *John Wick Chapter 2*, this is the mirrored in the "Reflections of the Soul" art exhibit scene.  In each work, the protagonist expertly evades fire by shooting from a supine position, a rare move at the time that would become a signature move for the John Wick character.  The scene in both works serves as the threshold between the social space of the gala and the surreal, perception bending environment of the exhibit. The target retreats into a space where visual distortion becomes a tactical advantage, and the protagonist follows, driving the confrontation into a setting that fragments sightlines and heightens tension.

80.     In addition to the gun-fu choreography in the art-show scenes, there is a knife fight sequence in art-show scene in both "Blood for Escobar" and *John Wick: Chapter 2*.  There are many attack options with a knife fight: one can stab with a thrust, there could be wrestling, blades held against a throat, over the top with knife coming down, wounds to the gut, face, but in both works, we have the same rapid, horizontal slashing through air technique in the scene with optically challenging reflections of shattered glass.

81.     Taken together, these elements—elegant setting, movement of the protagonist assassin quietly from periphery to center of high-end art exhibit, followed by an airborne tackle, wrist lock disarm, supine shooting method, shattering of long stem champagne glassware, statistically enormous and unprecedented kill count for an art exhibit scene, futuristic bass-

throbbing music, and the same sequence of the pursuit, from the exterior of the crowd to the interior of the exhibit and its optical illusions, with a knife fight and the antagonist's escape—form a sequence of highly specific narrative and choreographic elements that align closely with the structure and visual language of the *John Wick Chapter 2* museum confrontation.

82.     In both art-show scenes the antagonist gets away.  The trope thing to do in a big budget, big kill scene, would finish the movie there.  Yet in both works, the antagonist gets away and is finished by a bullet later at a different location, a location where guards are down, a public location, at night, drinking.  It is the Devil's Swan Club in "Blood for Escobar" and the Continental in *John Wick: Chapter 2*.  The similarity of the sequence and arrangement is uncannily striking.

83.     A further similarity is in the final scene of *John Wick: Chapter 2* when a woman dressed in black holding balloons randomly appears with the handler Winston—precisely the moment where the narrative reveals that every person in the courtyard is present because Winston summoned them, so none of the background figures are arbitrary.  This is copied from "Blood for Escobar" where balloons function as a symbolic motif tied to mortality. The first kill we see Alex do, the target has a balloon tied to his wheelchair.  The balloon flies off upon his death. A symbol of the death.  The placement of this unusual balloon image at a key narrative moment in *John Wick: Chapter 2*, combined with its symbolic function and intentional selection by the in story "puppet master," is another example of both works employing a similarly curated, non-incidental peripheral figure as part of the same expressive configuration.

***Car-Fu Scenes***

84.     The term car-fu is said to have originated with the *John Wick* franchise where the car is treated like a striking limb, scenes are choreographed like martial arts exchanges, the driver uses the vehicle with the same intentionality as a fighter uses fists or weapons.  However, car-fu scenes figure prominently in the "Blood for Escobar" prior to the creation of "Scorn" and the *John Wick* franchise.  The description of the driving by the character John Wick in "Scorn" mirrors the description of driving by Brice in "Blood for Escobar."  Brice, behind the wheel of the vintage Mustang, and the limo, is a professional NASCAR driver and the car-fu scenes with him

are described in a stripped-down prose, showing a tactical precision of the car-fu style. Plaintiff does not lapse into flowery description or fast and furious spectacle. Instead, he writes tight, functional, physical beats that emphasize skill and intent, the physics of weight, momentum, and impact used in specific techniques: "Slingshot" drafting, "Nose-Dive" bump and run, "Stomp-and-Spin" weight transfer. Brice is calm, handling a limo like a racecar, outrunning police while watching them shrink in the rearview mirror. The description of the character John Wick's driving in "Scorn" and in Kolstad's Movies mimics the car-fu description in "Blood for Escobar."

85.    In another example common to "Blood for Escobar and *John Wick: Chapter 2* a late-60s Mustang's door is powerful image as the car is weaponized against an attacking enemy in the middle of a chase scene, with the doorless late 60's Mustang fighting through the chase against multiple attacks. For example, in "Blood for Escobar," Tommy opens the door of the Mustang where it is ripped off by a pole, allowing Tommy to hang out of the doorless car and fire on the attackers. *See* Ex. A at 107. The scene continues with missing door of the Mustang, the interior of the car exposed, the protagonist exposed but thrusting forward, fighting. Similarly, in *John Wick: Chapter 2*, the door of the late-60's Mustang is thrown open to clothesline an attacking motorcyclist, causes the door to rip off, the scene continues with door missing, and the opening used by Wick to strike, the protagonist exposed but fighting.

86.    Additionally, the Mustangs in both "Blood for Escobar" and in *John Wick: Chapter 2* are used to crash through walls in order to strike attackers. While cars have crashed through walls in numerous films, these are not ordinary cars; these late 60's Mustangs are rare, precious in terms of their value. The 1967 Mustang featured in "Blood for Escobar" would be valued at approximately $1 million or more and the 1969 Mustang featured in *John Wick: Chapter 2* would be similarly valued at that price. Using such a precious care to smash through a wall to get at an attacker in a fight scene is not a common trope in film. It is thus original for the Mustang to be used deliberately as tactical entry tool. *See* Ex. A at 104 ("The Mustang zooms through the lobby's massive glass wall, setting off a crash louder than God."). It is then striking to see in John Wick: Chapter 2 a vintage Mustang worth a $1 million dollars intentionally crashed through a warehouse wall to intercept attackers.

*The "Why am I still alive."  Dialogue*

87.     In "Blood for Escobar", the protagonist, having taken out his antagonist Hector, begins his escape from the Company to Barbados but the Company is coming for him and intercepts him at the airport, unarmed.  He asks of the contact from the Company, "Why am I still alive."

88.     The same dialogue appears in the climax of *John Wick: Chapter 2* in a beat-for-beat choreographic and structural replica of the resolution in "Blood for Escobar."  Both scenes set up the dialogue with physical blocking, a "standing hero" following many violent fight scenes, walking up to his contact from the secret organization, Winston in *John Wick: Chapter 2*, the Contact in "Blood for Escobar," during the day-time, in a public place.  Winston and the Contact have caught up with rouge protagonists who are on the run from the secret organizations that have turned on their most valuable assets.

89.     The company handlers of our protagonists, both assert dominance through a casual demeanor.  The casual demeanor is communicated in with same expression in both *John Wick: Chapter 2* and "Blood for Escobar" when the protagonists are surprised.

90.     In "Blood for Escobar," Plaintiff paints the following picture:

INT. AIRPORT - MORNING

ALEX heads to the gate still not certain he's going to make it to the plane

alive. He sees the CONTACT sitting at the gate, reading a newspaper.

The blood drains.

CONTACT

(without taking his eyes off the newspaper)

Have a seat.

ALEX sits.  CONTACT flips a page, acting interested in the headlines.

ALEX

Why am I still alive?

CONTACT

(whispered)

Shhhhhh.

ALEX swallows a knot. CONTACT crosses his legs.

CONTACT

You're not.

(puts the paper down.)

I want you to leave the country, Alex. I want you to leave, and I don't want you to come back.  Because, as far as the company's concerned, you're in a body bag.  You understand?

ALEX reluctantly nods.

CONTACT

If it were up to my superiors, you would be dead by now. But me-I sympathize with your situation. I mean: you're a doctor for Christ's sake.

A good man . . . .  And, you're a complicated man . . . *like me*.

Ex. A at 114-115.

Similarly, in *John Wick: Chapter 2*, following the chaos of the previous night scene, the protagonist is surprised to see his handler from the covert organization, Winston, in the day-time, out in public, and, knowing he was hunted, and says to Winston: "Why am I alive?"  The protagonists in both works ask the almost identical question: "Why am I not dead?" and "Why am I alive?"  Both works have a similar response, a declaration of "life ownership."

***The Macro and Micro Overlays***

In standard industry screenwriting, it is generally understood that one page of screenplay text correlates directly to one minute of projected screen time.  A comparative overlay of "Blood for Escobar" and *John Wick: Chapter 2* demonstrates a 1:1 mathematical alignment in narrative architecture.  "Blood for Escobar" is a 119-page screenplay which translates to a 119-minute feature film. *John Wick: Chapter 2* features a main narrative runtime (excluding end credits) of approximately 118 to 119 minutes, a nearly identical total footprint.

In "Blood for Escobar" we have the final high-stakes spoken interaction between the protagonist and his handler concluding precisely at the top of Page 116 after which we have

exactly 3 pages of unvoiced, description-heavy action to execute the protagonist's flight response before the script terminates on page 119. In *John Wick: Chapter 2*, the final spoken dialogue beat between John Wick and the institutional authority figure Winston concludes precisely at the 1:55:30 mark, leaving exactly 3 minutes of a non-verbal, paranoid run-out sequence before the credits roll at 1:58:42.

The imagery of the two scenes is also strikingly similar. In "Blood for Escobar," we first see the Contact "without taking his eyes off the newspaper." The same imagery is created in *John Wick: Chapter 2*, as we see Winston, aloof, without any alarm of the approaching assassin, looking away of the protagonist. In "Blood for Escobar," we have the "Why am I still alive?" and the Contact whispers "Shhhh" and "crosses his legs." In *John Wick: Chapter 2*, we see Winston with his legs crossed. In "Blood for Escobar," the Contact gives the protagonist a gift. In response to the "why am I still alive?" question, the Contact says, "I want you to leave, and I don't want you to come back. Because, as far as the company's concerned, you're in a body bag. You understand?" In *John Wick: Chapter 2*, Winston grants him an hour to run. The handler in both works claims credit for the hero's existence, asserting that the hero only breathes by the handler's permission. This creates a "system exile" engine for a sequel in both works.

In the action-thriller genre, a final mentor, handler, or authority confrontation typically lands in the final movement to launch the protagonist into a closing sequence. However, the choice to execute this structural drop-off point at the exact same mathematical juncture— allocating exactly three final pages or three final minutes to a silent, high-tension closing movement—constitutes an identical underlying pacing strategy.

This identical temporal grid is populated by a highly specific, mirrored progression of character dynamics, spatial mechanics, and narrative beats occurring simultaneously within this final block. Both protagonists are forced into a sudden venue change orchestrated by the authority figure, which intentionally neutralizes the protagonist's primary defensive mechanism and shifts the balance of power entirely to the Handler. In "Blood for Escobar," the Contact forces a critical venue change, an airport where he is in public, unarmed, leaving the protagonists vulnerable. In *John Wick: Chapter 2*, the protagonist is summoned by Winston to an open,

civilian public space, Central Park, shifting the interaction away from the Continental hotel grounds—where institutional rules protect John Wick from contract hits.

The blocking here is strikingly similar.  Standard cinema typically resolves a high-stakes handler-asset confrontation through overt physical threats or aggressive, kinetic blocking.  "Blood for Escobar" and *John Wick: Chapter 2* both consciously subvert this expectation by utilizing hyper-casual physical postures to project authority.  In "Blood for Escobar," the Contact sits with legs crossed, completely relaxed, and deliberately maintains no eye contact with the protagonist, his most lethal asset.  Withholding visual engagement while maintaining a casual physical posture serves as a chilling, highly specific manifestation of absolute dominance and lack of fear.  Similarly, *John Wick: Chapter* 2, Winston sits calmly on a park bench, legs crossed, completely unthreatened by his most lethal asset, detachedly dictating terms from a position of absolute, stationary institutional power.

The final dialogue block cements an identical structural shift in the protagonist's relationship to the governing underworld organization.  In both works, the protagonist officially transitions from a highly protected institutional asset to an absolute target.  They are declared officially dead to the company/system, excommunicated, and marked for open liquidation.  But despite this total severing of institutional ties, the dialogue in both works explicitly addresses the lingering mechanics of survival—specifically referencing that the protagonist may need a favor in the future, keeping the underworld's transactional ledger open.  The conclusion of the dialogue immediately triggers the exact same macro-narrative objective.  The protagonist must immediately flee the country.

//

//

***Thematic Architecture***

91.     Both "Blood for Escobar" and the Infringing Works explore themes of violence as ritual.  The killing is depicted as controlled, with precision, discipline, the obvious result of ritualistic preparation, a soldier's mindset rather than a superhero's.  The killing is methodical and meditative, violence evocative of a religious practice.  In each work, there is a staggering body

count.  Prior to the creation of "Blood for Escobar" in 2010, triple-digit kills in grounded, realistic assassin films were not mainstream.

92.     The theme of masculinity, aging, and the body is common "Blood for Escobar" and the Infringing Works.  With the character Tommy, Plaintiff describes the old age of the retired assassin, early 60s, a slower, stiffer, more deliberate man who feels every injury, not a superhero fantasy — it's a story about a man whose body is failing but whose will is absolute.  Kolstad does the same with the John Wick character in "Scorn."  The lesson is that aging doesn't diminish purpose; it sharpens it.  The age makes his violence more tragic, not less impressive.

93.     There is also the theme of justice versus vengeance common to the works at issue.  In "Blood for Escobar" and the Infringing Works, a sharp line between justice, which is societal, procedural, rational, is shown to separate it from vengeance, which is personal, emotional, and absolute.  The assassins in the stories never pretend it is justice they are seeking.  Vengeance is not about fairness — it's about restoring a personal moral universe shattered by loss.

94.     There is the theme of the cost of returning to violence.  "Blood for Escobar" and the Infringing Works do not glamorize the violence but use violence to show emotional regression, physical deterioration, and isolation from normal society.  A man becoming the ghost others already believe him to be, so even his victories feel like losses.  Violence may solve the immediate problem, but it destroys the person who wields it.

95.     The theme codes as civilization is explored in each work.  The Company in "Blood for Escobar", the Continental in "Scorn," and the High Table in Kolstad's Movies each have rules but the rules are not world building— they represent order within a criminal underworld, civilization within violence, a moral framework for immoral acts.  Alex and John Wick have an initial adherence to the code that separates them from their antagonists.  The lesson is even killers need rules — without them, violence becomes meaningless.

96.     The works each explore the theme of love as redemption and as vulnerability.  Love is the only force strong enough to pull the protagonists out of their death circles and into a space of empathy and healing as well as rebirth through pain.  In the final scenes of "Scorn" and "Blood for Escobar", the protagonists, having neared death, choose life, responsibility,

connection.  It is not a happy ending; it is a reset.  The lesson is rebirth is possible, but only through suffering — and only if you choose it.

## FIRST CLAIM FOR RELIEF

### (Direct Copyright Infringement by Kolstad)

### (17 U.S.C. § 101 et seq.)

97.     Plaintiff realleges the above-paragraphs and incorporate them by reference as if fully set forth herein.

98.     "Blood for Escobar" is an original work of authorship, embodying copyrightable subject matter, subject to the full protection of the United States copyright laws.

99.     Plaintiff owns all rights, title and interest in and to the copyrights in "Blood for Escobar".

100.    As a result of Plaintiff's submission of "Blood for Escobar" to number screenwriting contests, Kolstad was able to obtain access to "Blood for Escobar" from numerous production companies and agencies associated with these contests.

101.    The Infringing Works are substantially similar to and copied from, "Blood for Escobar" and thus infringe upon the exclusive rights of Plaintiff rights in violation of the Copyright Act, 17 U.S.C. §501.

102.    As a direct and proximate result of Kolstad's infringement of Plaintiff's exclusive rights in "Blood for Escobar", Plaintiff is, pursuant to 17 U.S.C. § 504(b), entitled to recover actual damages resulting from Kolstad's uses of "Blood for Escobar" without paying license fees, in an amount to be proven at trial.

103.    In addition, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to recover damages based on a disgorgement of Kolstad's profits from infringement of "Blood for Escobar", amounts will be proven at trial.

104.    Kolstad's conduct has caused and any continued infringing conduct will continue to cause irreparable injury to Plaintiff unless enjoined by this Court.  Plaintiff has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting infringement of "Blood for Escobar."

## SECOND CLAIM FOR RELIEF

### (Direct Copyright Infringement by Thunder Road)

105.    Plaintiff realleges the above-paragraphs and incorporate them by reference as if fully set forth herein.

106.    "Blood for Escobar" is an original work of authorship, embodying copyrightable subject matter, subject to the full protection of the United States copyright laws.

107.    Plaintiff owns all rights, title and interest in and to the copyrights in "Blood for Escobar".

108.    The Kolstad Movies are substantially similar to and copied from, "Blood for Escobar" and are thus infringing works.

109.    Thunder Road has distributed the infringing Kolstad's Movies and reproduced copies of these films that are unlawful copies of "Blood for Escobar," thus infringing Plaintiff's exclusive rights in violation of the Copyright Act, 17 U.S.C. §501.

110.    As a direct and proximate result of Thunder Road's infringement of Plaintiff's exclusive rights in "Blood for Escobar", Plaintiff is, pursuant to 17 U.S.C. § 504(b), entitled to recover actual damages resulting from Thunder Road's uses of "Blood for Escobar" without paying license fees, in an amount to be proven at trial.

111.    In addition, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to recover damages based on a disgorgement of Thunder Road's profits from infringement of "Blood for Escobar", amounts will be proven at trial.

112.    Thunder Road's conduct has caused and any continued infringing conduct will continue to cause irreparable injury to Plaintiff unless enjoined by this Court.  Plaintiff has no adequate remedy at law.  Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting infringement of Plaintiff's exclusive rights under copyright law.

## THIRD CLAIM FOR RELIEF

### (Direct Copyright Infringement by Lions Gate)

### (17 U.S.C. § 101 et seq.)

113. Plaintiff realleges the above-paragraphs and incorporate them by reference as if fully set forth herein.

114. "Blood for Escobar" is an original work of authorship, embodying copyrightable subject matter, subject to the full protection of the United States copyright laws.

115. Plaintiff owns all rights, title and interest in and to the copyrights in "Blood for Escobar".

116. The Infringing Works are substantially similar to and copied from, "Blood for Escobar".

117. Lions Gate is distributing Kolstad's Movies and reproducing copies of films that are unlawful copies of "Blood for Escobar", thus infringing Plaintiff's exclusive rights in violation of the Copyright Act, 17 U.S.C. §501.

118. As a direct and proximate result of Lions Gate's infringement of Plaintiff's exclusive rights in "Blood for Escobar", Plaintiff is, pursuant to 17 U.S.C. § 504(b), entitled to recover actual damages resulting from Lions Gate's uses of "Blood for Escobar" without paying license fees, in an amount to be proven at trial.

119. In addition, pursuant to 17 U.S.C. § 504(b), Plaintiff shall be entitled to recover damages based on a disgorgement of Lions Gate's profits from infringement of "Blood for Escobar", amounts will be proven at trial.

120. Lions Gate's conduct has caused and any continued infringing conduct will continue to cause irreparable injury to Plaintiff unless enjoined by this Court. Plaintiff has no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a permanent injunction prohibiting infringement of Plaintiff's exclusive rights under copyright law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

1. A declaration Defendants have infringed Plaintiff's copyrights under the Copyright Act;

2. A declaration that such infringement is willful;

3.      An accounting of all revenue earned by Defendants during the period in which it reproduced, distributed, publicly performed or displayed the Infringing Works;

4.      Awarding Plaintiff all gains, profits, property and advantages obtained or derived by Defendants from their acts of copyright infringement, in amount in excess of $10,000,000.00.

5.      Awarding Plaintiff such exemplary and punitive damages as the Court finds appropriate to deter any future infringement;

6.      Awarding Plaintiff interest, including pre-judgment interest, on the foregoing sums;

7.      Permanently enjoining Defendants, their employees, agents, officers, directors, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with them, from directly or indirectly infringing Plaintiff's copyrights or continuing to market, offer, sell, dispose of, license, lease, transfer, public display, advertise, reproduce, develop or manufacture any works derived or copied from the Plaintiffs' or to participate or assist in any such activity; and

8.      For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

LOWE & ASSOCIATES,, P.C.

Dated:  06/01/2026

STEVEN T. LOWE, ESQ.
ALEKSANDRA M. HILVERT, ESQ.

LAW OFFICE OF R. TERRY PARKER LLC

_R. Terry Parker_

Dated:  5/22/2026

R. TERRY PARKER, ESQ.

COMPLAINT AND JURY DEMAND
CASE NO.                                                              28